# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### BLUEFIELD

**TIMOTHY WISE,**

> **Plaintiff,**

**v.**                                                    **Civil Action No. 1:20-cv-00056**

**C. MARUKA, et al.,**

> **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Come now the individual Defendants, by and through undersigned counsel, Matthew Lindsay, Assistant United States Attorney for the Southern District of West Virginia, and submit this Memorandum of Law in Support of Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.

## I.  STATEMENT OF THE CASE

Timothy Wise ("Plaintiff"), Register Number 03540-063, is a federal inmate presently confined at the Federal Correctional Institution ("FCI") McDowell, West Virginia. See Defendants' Exhibit 1, Declaration of Robert Malone, Attachment A, Inmate History Adm-Rel.

This action is brought as a civil rights action pursuant to Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  The Court states that it has construed Plaintiff's claims to be as follows: (1) Defendants Malone, Pilant, and Phillips have denied him access to the administrative remedy process; (2) Defendants have acted with deliberate indifference to his serious medical needs; (3) Defendants used excessive force when placing him in restraints; (4) Defendants have denied him dental care since his arrival at FCI

McDowell; (5) Defendants have placed him in the Special Housing Unit ("SHU") in violation of his constitutional rights; (6) Defendants have opened his legal mail in violation of his constitutional rights and BOP policy; and (7) Defendants have denied him visitation from approved visitors in violation of his due process rights.[1]

Plaintiff names as defendants Bureau of Prisons staff (1) Warden Maruka; (2) Unit Manager Pilant; (3) Correctional Counselor Phillips; (4) Correctional Counselor Malone; (5) Health Services Administrator Thompson; (6) Lieutenant Saunders; (7) Senior Officer Kendrick; (8) Senior Officer Sanders; (9) Senior Officer Specialist Harold; (10) Supervisory Correctional Systems Specialist Green; (11) Senior Officer Cook; (12) Registered Nurse Walters; (13) SIS Technician Horton; (14) Registered Nurse Wyatt; (15) Registered Nurse Alexander; (16) Physician Assistant Carothers; (17) Trust Fund Supervisor Shrader; (18) Associate Warden Rich; (19) Human Resources Specialist Marsh; and (20) Captain Munn. ECF No. 4, 7.

For the reasons stated below, the Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment should be granted.

## II. STATEMENT OF FACTS [2]

### A. Inmate Placement in SHU

The SHU at FCI McDowell, like SHUs throughout the Bureau of Prisons, is a housing unit where inmates are securely separated from the general inmate population. See Defendants' Exhibit 2, Declaration of Richard Smith, Attachment A, Program Statement 5217.02 Special Housing Units. SHUs are designed to "help ensure the safety, security, and orderly operation of

---

[1] This synopsis of Plaintiff's Complaint applied to his initial filings at ECF No. 4 & 7. However, Plaintiff's Second Amended Complaint contains similar wording and allegations with the exception of adding specific allegations regarding Defendant's Munn and Marsh. See ECF No. 37.

[2] This section discusses facts relating to Plaintiff's complaints relating to his SHU placement. His medical history will be discussed at a later point in this memorandum.

correctional facilities, and protect the public, by providing alternative housing assignments for inmates removed from the general population." _See_ _id_.

When an inmate first arrives in SHU, they are placed in either administrative detention status or disciplinary segregation status. _See_ _id_. Administrative detention status is simply to remove an inmate from the general population when necessary to meet the safety and security needs of the facility or the public. _See_ _id_. This status is non-punitive and can occur for a variety of reasons such as if an inmate is pending classification or reclassification or if an inmate is in holdover status during transfer to another institution or destination. _See_ _id_. This status also applies to inmates who are under investigation for disciplinary or criminal actions. _See_ _id_.

Inmates can be placed in administrative detention status in SHU for protective custody if they are the victim of an inmate assault or threat, if they provided or are perceived as having provided information to staff or outside law enforcement regarding other inmates or persons, if staff has reason to be concerned for an inmate's safety in general population, or if an inmate refuses to enter general population but does not provide specific details regarding any threats against them. _See_ _id_.

When an inmate enters SHU for protective custody, an investigation into the threat is conducted by BOP staff. _See_ _id_. If, at the close of the investigation, there is a verified need for protection, the inmate will remain in SHU or be transferred to another institution where the inmate may be able to return to general population. _See_ _id_. If the staff investigation fails to verify the need for protective custody, the inmate will be instructed to return to general population. _See_ _id_.

**B. Plaintiff's Placements in SHU**

Review of Plaintiff's housing assignment history reveals he has been in SHU at FCI McDowell from September 23 through October 9, 2019, October 28 through November 27,

2019, December 9 through December 31, 2019, and December 31, 2019 through the present.[3] See id., Attachment B, Inmate History-Quarters. During these times, he has been in SHU in administrative detention status. See id. As stated above, this status is non-punitive, and an inmate may be placed in this status while there is a pending investigation into disciplinary issues or security issues. See id. The decision for an inmate to remain in administrative detention pending the outcome of an investigation is made based on factors that take into account the safety and security of the inmate, staff, and the institution. See id.

Plaintiff was placed in SHU in administrative detention status on September 23, 2019, October 28, 2019, and December 9, 2019 for investigation into suspected use of illicit substances. See id., Attachment C, Staff Memos.

Plaintiff was placed in Special Housing on December 31, 2019 after Defendant Pilant received information from other inmates that, due to Plaintiff's frequent drug use, the inmates were going to assault Plaintiff if he was not removed from general population. See id., Attachment D, Threat Assessment Investigation. Defendant Pilant reported the threat, and the decision was made to place Plaintiff back in SHU for his safety. See id.

### C. Threat Assessment Investigation and Conclusions

FCI McDowell's Special Investigative Services ("SIS") Department is responsible for conducting investigations related to the safety and security of the institution. See id. In this case, SIS conducted an investigation to determine if Plaintiff could safely return to general population. See id., Attachment D.

The subsequent threat assessment investigation involved the interview of several inmates incarcerated in general population at FCI McDowell. See id. It was discovered through

---

[3] Plaintiff was placed in general population for approximately 4 hours on December 31, 2019 before being placed back in SHU for his protection the same day. See id.

interviewing other inmates that Plaintiff purchased K2 (an illicit substance) from inmates with the Security Threat Group assignment of Black Gangster Disciples in large quantities. See id. It was further learned that Plaintiff "smoked K2 every day," and that other inmates were "always trying to keep Plaintiff out of the way so that staff didn't see him." See id. The inmates interviewed stated Plaintiff gets aggressive while high on K2 and eventually could hurt another inmate or staff. See id.

One inmate that was interviewed stated that Plaintiff should not be released to general population because "the White inmates don't want him out due to his drug use." See id. The inmate stated further that "we all came together and decided it's best he doesn't come back out here. No one wants to share a cell with him because he's always bringing the cops in because they know he uses." See id. When asked what would happen if Plaintiff returns to general population, the inmate stated, "someone will take care of that situation because we don't want to deal with it anymore." See id. The inmate was asked if Plaintiff would be assaulted, and the inmate responded, "yes by someone no doubt." See id.

The investigator also reviewed documents related to Plaintiff from the time he was incarcerated at FCI McDowell. Specifically, it was noted that Plaintiff arrived at FCI McDowell on July 23, 2019 and was placed in B4 Housing Unit. See id. On September 23, 2019, Plaintiff was placed in SHU due to possible use of narcotics. See id., Attachments B & C.

Plaintiff was released to General Population and placed in C1 Housing Unit on October 9, 2019. See id., Attachment B.

On October 28, 2019, an inmate acting as a confidential informant informed SIS staff that Plaintiff had been smoking all day and was in his cell barely able to stand. See id., Attachment D. The housing unit officer checked on him and found him unsteady in his stance and his speech was slurred. See id. Plaintiff was placed back in SHU. See id., Attachment B.

Plaintiff was released back to General Population again on November 27, 2019.  See id. On December 9, 2019, a medical emergency was called in C1 Housing Unit due to Plaintiff being unresponsive in his cell.  See id., Attachments B, C, & D.  This resulted in Plaintiff being sent on an outside medical trip to a local hospital.  See id., Attachment D.

While in SHU on January 1, 2020, the SHU Lieutenant was conducting rounds and observed Plaintiff standing next to the toilet shaking and swaying from side to side.  See id. When he attempted to get Plaintiff to acknowledge him, Plaintiff ignored the request.  See id. When Plaintiff was directed to submit to hand restraints, Plaintiff fell to the floor.  See id.  At that time, a medical emergency was called, the cell door was opened, and Plaintiff was transported to a local hospital.  See id.

Plaintiff's cell mate at that time was removed from the cell, and it was observed he was also slurring his words and had a cut on the top of his head.  See id.  The cell smelled of smoke, and due to the possibility of staff harm, the cell was secured and searched the next day.  See id.

On January 2, 2020, the cell was searched, and a homemade smoking pipe was found with several strips of paper in an envelope on the table.  See id.  The items were tested and produced a positive result for Amphetamines.  See id.  Both inmates received an incident report for Code 113 Possession of any narcotic.  See id.

After reviewing the incidents of Plaintiff's narcotics use, the investigator also addressed the reasons Plaintiff's behavior was not sanctioned.  See id.  Regarding the January 1, 2020 incident, Plaintiff's cellmate took responsibility for incident report, and Plaintiff's own incident report was expunged.  See id., Attachment D & E, Inmate Discipline Data.  Plaintiff had also been issued an incident report for the October 28, 2019 and September 23, 2019 incidents, but he was able to get them expunged by the Discipline Hearing Officer by citing to his history of seizures.  See id.

Plaintiff was drug tested in connection with each suspected substance abuse incident with negative results. See id. However, it had been found that a new K2 white powder substance had been introduced to the prison that might not result in a positive test due to the way it was being made and broken down inside the prison. See id.

Plaintiff also had a medical history of seizures. See id. Therefore, his use of drugs was masked by this condition. See id. However, medical staff inside the institution have stated Plaintiff was clearly under the influence of an illicit substance during the instances where he has been seen in health services for evaluation. See id.

At the conclusion of the investigation, the investigator concluded there was a verified threat against Plaintiff. See id. Specifically, it was determined that the White inmates had a plan to assault Plaintiff if he returned to general population due to his frequent drug use. See id.

Because of the results of the investigation, it was recommended that Plaintiff receive a transfer to a facility commensurate with his security and programming needs. See id. Plaintiff will remain in SHU until he is transferred or until new information is received that the threat to Plaintiff's safety no longer exists. See id.

## III. STANDARD OF REVIEW

### A. Rule 12(b)(6)

A motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6) serves to test the legal sufficiency of a complaint. See District 28, UMWA v. Wellmore Coal Corp., 609 F.2d 1083, 1085-86 (4th Cir. 1979)(Rule 12(b)(6)'s purpose "is to provide a defendant with a mechanism for testing the legal sufficiency of the complaint."). While a court must accept the factual allegations in a complaint as true when considering a Rule 12(b)(6) dismissal, the court is not bound by the legal conclusions, "otherwise, Rule 12(b)(6) would serve no function . . . ."

Wellmore, 609 F.2d at1085-86. Stated another way, the reviewing court "need not accept [as true] unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Markets v. J.D. Assoc. Ltd., 213 F.3d 175, 180 (4th Cir. 2000). Moreover, "[t]he presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support [the legal conclusion] . . . .). Young v. City of Mount Ranier, 238 F.3d 567, 577 (4th Cir. 2001).

Stated plainly, a court should dismiss a complaint if it appears beyond doubt "that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." See Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)(citations omitted).

## B. Rule 12(b)(1) Dismissal for Lack of Subject-Matter Jurisdiction

Subject-matter jurisdiction is a threshold issue that a court must resolve at the outset of a case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998). When a defendant challenges subject-matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction. Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). "[W]hen a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004); Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995)("[T]he trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.")(internal quotes omitted).

## C. Motion for Summary Judgment

The entry of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Lujan v. National Wildlife Federation, 497 U.S. 871, 884 (1990)(citations omitted). In determining whether summary judgment should issue, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The burden is placed on the moving party to establish the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party may not rest on the allegations in its pleadings. Instead, the non-moving party must set forth specific facts showing that a genuine issue of material fact exists through use of affidavit and other evidence. Lujan, 497 U.S. at 884. Thus, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (citations omitted).

### IV. ARGUMENT

Plaintiff arrived at FCI McDowell on July 23, 2019 and has remained incarcerated at that institution through the date of the filing of this Motion. See Defendants' Exhibit 1, Attachment A. Plaintiff's allegations span nearly every aspect of his confinement at FCI McDowell, each of which will be summarized and addressed in turn.

Defendants will begin by addressing arguments related to jurisdictional and procedural issues including the failure of Plaintiff to exhaust his administrative remedies and the fact that Plaintiff's claims are not cognizable under Bivens.

Defendants will then address the sufficiency of the pleadings in relation to Plaintiff's claims. Thereafter, Defendants will address Plaintiff's claims related to his medical care and

treatment.  Defendants will conclude by addressing Qualified Immunity and its applicability to all claims within Plaintiff's Complaint.

## A. Exhaustion of Administrative Remedies

In 1995, Congress enacted the Prison Litigation Reform Act ("PLRA").  The PLRA revised the exhaustion provision of 42 U.S.C. § 1997 as follows:

> **(a) Applicability of administrative remedies**
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility **until such administrative remedies as are available are exhausted.**

42 U.S.C. § 1997e(a)(emphasis added).  In Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court held that exhaustion of administrative remedies is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes. . . ." Id. at 992.

The United States Supreme Court has also held that proper exhaustion of administrative remedies is necessary, thus precluding inmates from filing untimely or otherwise procedurally defective administrative grievances or appeals and then pursuing a lawsuit alleging the same conduct raised in the grievance.  See Woodford v. Ngo, 548 U.S. 81 (2006)("[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.").

Courts within the Fourth Circuit have consistently held that unsubstantiated and conclusory assertions by inmate plaintiffs that prison grievances were hindered, without providing any details regarding the date the alleged grievances were submitted or to whom they were submitted, are insufficient to withstand summary judgment. Barnett v. Alamance Cnty.

Sheriff Office Det. Ctr., Case No. 1:14cv732, 2016 WL 1389606, at *2 (M.D.N.C. Apr. 7, 2016)(holding that conclusory allegation that "[m]edical Staff refused to allow [him] to receive a medical grievance" did not raise genuine issue of material fact); Stohl v. E. Reg'l Jail, Case No. 1:14cv109, 2015 WL 5304135, at *7 (N.D. W. Va. Sep. 8, 2015)(holding that conclusory allegation that unnamed prison staff "discarded" his grievances "not only is unsupported by any evidence in the record, but is belied" by plaintiff's successful filing of other grievances during same time period); Salazar v. Holder, Case No. 3:14cv23, 2015 WL 574800, at *5 (N.D. W. Va. Feb. 11, 2015)(overruling plaintiff's objections that grievance procedures were "unavailable" when such objections were "limited to naked assertions without any specificity or evidentiary support.").

Pursuant to 28 C.F.R. § 542.10, *et seq.*, the BOP has established an administrative remedy procedure through which an inmate may seek a formal review of an issue or complaint relating to his confinement. If an inmate is unable to resolve his complaint informally, he may file a formal written complaint with the institution on the proper form within 20 calendar days of the date of the occurrence on which the complaint is based. See 28 C.F.R. § 542.14(a). If an inmate is not satisfied with the institutional Warden's response, he may appeal, using the appropriate form, to the Regional Director within 20 calendar days of the Warden's response. See 28 C.F.R. § 542.15(a). If the inmate is still not satisfied, he may appeal the Regional Director's response to the Office of General Counsel, located in the BOP's Central Office in Washington, D.C., using the appropriate forms. The inmate must file this final appeal within 30 calendar days of the date the Regional Director signed the response. Id. Appeal to the General Counsel is the final administrative appeal. See 28 C.F.R. § 542.15(a).

As a practical matter, an inmate wishing to file an administrative remedy must obtain the appropriate form from his or her Correctional Counselor. See Defendants' Exhibit 1. Once the

inmate has filled out the form, he returns the completed form to the Correctional Counselor.  Id. The Correctional Counselor then delivers the form to the institution's Administrative Remedy Clerk, who in turn is responsible for all clerical processing of the administrative remedies.[4]  Id.

For inmates housed in the SHU, Unit Team members, including Correctional Counselors, regularly conduct rounds in SHU to address the needs of inmates on their caseload who are housed in SHU.  See id.  If an inmate requests an administrative remedy form from their Correctional Counselor during the SHU rounds, the Correctional Counselor provides them with the appropriate form and will return to collect the form when the inmate has completed it.  See id.

An inmate's Administrative Remedy filing history is available for review through SENTRY as an Administrative Remedy Generalized Retrieval Form.  See Respondent's Exhibit 1.  When reviewing Administrative Remedy Generalized Retrieval Forms, Administrative remedy numbers identify at what level the remedy was filed and the number of times the remedy was filed at that level.  See id.  A remedy filed at the institution level is identified by an F, at the Regional Office level an R, and at the Central Office level an A.  See id.  An initial remedy filed at the institution level is assigned an F1.  See id.  If the administrative remedy is rejected and re-filed at the institutional level, the re-filed remedy is identified as F2.  See id.  The same system is used for all three levels.

If a remedy is rejected, it is entered into the SENTRY system along with a code noting the reason for the rejection.  See id.  It is then returned in its entirety to the inmate.  See id. Ordinarily, materials from the rejected submission are not copied or retained.  See id.

---

[4] Since Plaintiff has been incarcerated at FCI McDowell, he has been assigned to the caseload of Defendant Malone. See Defendants' Exhibit 1, Attachment B, SENTRY Inmate History Correctional Counselor. While Plaintiff alleges that Defendants Phillips and Pilant interfered with his filing of administrative remedies, Defendant Malone was the only named Defendant who at any point was responsible for providing Plaintiff with Administrative Remedy forms or for accepting completed forms from Plaintiff for filing. See id.

During the time Plaintiff has been designated to FCI McDowell, he has filed or attempted to file only one administrative remedy. Id., Attachment C, SENTRY Administrative Remedy Generalized Retrieval. Plaintiff filed Remedy ID No. 980859-A1 at the Central Office level on August 8, 2019, in which Plaintiff challenged the findings in a Discipline Hearing Officer ("DHO") hearing related to an incident report he received at FCI Talladega. Id. This remedy was closed and a response provided on September 30, 2019. Id. Plaintiff filed no other administrative remedies while incarcerated at FCI McDowell. See id.

Plaintiff attempts to excuse his failure to exhaust, asserting that staff refused to provide him with administrative remedy forms. ECF No. 4. However, Plaintiff was able to file an administrative remedy while incarcerated at FCI McDowell.[5] See id. Additionally, Defendant Malone, Plaintiff's Correctional Counselor, conducted regular rounds in SHU during the time frame addressed in his Complaint, and Counselor Malone provided administrative remedy forms as requested to Plaintiff. See Defendants' Exhibit 1. Plaintiff's bald assertion that he was denied access to the administrative remedy program is not supported by any evidence, and Plaintiff should not be excused from the exhaustion requirements. His claims, therefore, should be dismissed.

## B. Plaintiff has failed to exhaust his claims of disability discrimination

The Department of Justice ("DOJ") has established administrative procedures for the assertion and investigation of disability discrimination complaints in correctional facilities. 28 C.F.R. § 39.101-103. Section 39.170(d) provides a comprehensive administrative complaint procedure as to "all allegations of discrimination on the basis of handicap or programs or activities conducted by the agency."

---

[5] This Court's recent Opinion in Hancock v. Rickard, et al., 1:18:cv:00024, pg. 20 (Faber, March 30, 2020) also found it relevant that the plaintiff in that case, while claiming to be unable to file administrative remedies in SHU, was still able to institute a civil action and file documents received by the Court in association with that case. The Court found that this demonstrated he was not unable to file administrative claims in SHU. See id., pg. 20.

"Before filing a complaint under this section, an inmate of a Federal penal institution must exhaust the BOP administrative procedure as set forth in part 28 CFR, part 542." 28 C.F.R. § 39. 170(d)(l)(ii). This mandatory procedure is reiterated in bureau of Prisons Program Statement 3713.024 where it states:

> (1) Any person who believes that he or she has been subjected to discrimination . . . may, by him- or herself or by his or her representative, file a complaint with the Director of EEO for the Department of Justice or his or her designee pursuant to Title 28 CFR, Part 39. However, **inmates who allege disability discrimination by the Bureau must first exhaust the Bureau's Administrative Remedy Procedure** as set forth in 28 CFR 39.170(d)(1)(ii).

(emphasis added). Thus, exhaustion with the BOP is a prerequisite to filing through the DOJ.

Even if a plaintiff has exhausted his administrative remedies through the BOP, as Plaintiff in this case has not, the DOJ procedures outlined in 28 C.F.R. § 39.170 must also be exhausted before Plaintiff may seek judicial review in disability discrimination claims. See, e.g. O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1061-63 (9th Cir. 2007); Scott v. Goord, 2004 WL 2403853, *7 (S.D.N.Y., Oct. 27, 2007). These regulations are "precisely the sort of pre-litigation process contemplated by the [Porter v.] Nussle Court, and section 1997e clearly applies the exhaustion of remedies mandate to the ADA and Rehabilitation Act as 'other Federal law.'" Id.

"Exhaustion of the DOJ procedures would also serve the same goals that the PLRA was enacted to achieve," since the PLRA was meant to "reduce the quantity and improve the quality of prisoner suits," and to "afford[ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." William G. v. Pataki, 2005 WL 1949509, *5 (S.D.N.Y Aug. 12, 2005).

"Because the DOJ procedures fall within the plain language and the purpose of the PLRA, they must be exhausted as a matter of law before a prisoner may bring suit." Id. at *6. In

reaching this conclusion, the court rejected the argument that the PLRA only applied to "internal prison administrative remedies and not external remedies such as those provided by the DOJ." Id. at *4.

The court found that "the language of the PLRA contains no indication that the requirement is so limited, and the reasoning behind the statute strongly supports the conclusion that available external remedies must also be exhausted." Id.; see also Burgess v. Goord, No. 98 CIV. 2077 (SAS), 1999 WL 33458, *7 & n. 6 (S.D.N.Y., Jan. 26, 1999)("These claims would be dismissed in any event as plaintiff has failed to exhaust the administrative remedies promulgated by the Department of Justice to address 'all allegations of discrimination on the basis of handicap in programs or activities conducted by the agency.'"), citing 28 C.F.R. § 39.170; Crowder v. True, No. 91 CIV. 7427, 1993 WL 532455, *5 (N.D. Ill., Dec. 21,1993)(inmate's failure to exhaust administrative remedies under 28 C.F.R. § 39.170 are "fatal" to his claims). Accordingly, all of Plaintiff's claims related to disability discrimination must be dismissed for failure to exhaust administrative remedies, both internally and through the DOJ.

### C. Plaintiff's Allegations are Not Cognizable Under Bivens

Plaintiff's claims are not cognizable under Bivens and should be dismissed. Addressing implied damages remedies under Bivens, the United States Supreme Court observed that only three cases have ever been recognized as Bivens claims by the Court: "[A] claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." Ziglar v. Abbasi, __U.S.__, 137 S.Ct. 1843, 1860 (2017)(internal citations omitted). The Court made it clear that the "three cases—Bivens, Davis, and Carlson—represent[ed] the **only** instances in which the Court has approved of an implied damages remedy under the Constitution itself." Abbasi, 137 S.Ct. at 1855 (emphasis added).

In _Abbasi_, the Supreme Court set out the framework for determining whether _Bivens_ should be extended to contexts outside of _Bivens_, _Davis_ and _Carlson_, in light of the Court's tempered and deferential approach.  The framework is as follows:  First, a court must consider whether a claim of a constitutional violation presents a 'new _Bivens_ context,' which is determined by simply asking whether "the case is different in a meaningful way from previous _Bivens_ cases decided by [the Supreme] Court . . . ."  _Abbasi_, 137 S.Ct. at 1859.  If the answer is yes, the court must conduct a special factors analysis, asking (a) whether alternative remedies exist, and (b) whether special considerations exist to counsel hesitation in creating a _Bivens_ remedy.  _See Abbasi_, generally.

If there are any alternative remedies available other than expanding _Bivens_, the power of the court to infer a new cause of action is limited.  _Abbasi_, 137 S. Ct. at 1858 ("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new _Bivens_ cause of action.").  _See also Wilkie v. Robbins_, 551 U.S. 537, 550 (2007)("any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.")(citing _Bush v. Lucas_, 462 U.S. at 378).   Additionally, if there are any special factors counseling hesitation, _Bivens_ cannot be extended.  _See Abbasi_, 137 S. Ct. at 1857 ("The Court's precedents now make clear that a _Bivens_ remedy will not be available if there are 'special factors counselling  hesitation in the absence of affirmative action by Congress.'").

The Supreme Court has recently reiterated the principles highlighted in _Abbasi_, namely that regarding the recognition of an implied damages remedy, "In both statutory and constitutional cases, our watchword is caution."  _Hernandez v. Mesa_, 589 U.S. ____ (slip op., at 6)(2020).  The Court went on to say:

> We have recognized that Congress is best positioned to evaluate "whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government" based on constitutional torts. We have stated that expansion of Bivens is "a 'disfavored' judicial activity," and have gone so far as to observe that if "the Court's three Bivens cases [had] been . . . decided today," it is doubtful that we would have reached the same result. And for almost 40 years, we have consistently rebuffed requests to add to the claims allowed under Bivens.

Hernandez, 589 U.S. _____ (slip op. 6-7).   As argued below, an implied remedy pursuant to Bivens should not be recognized in this case, and the Defendants should be dismissed from this action.

### a. New context claims

In Hernandez, the Supreme Court declined to extend Bivens even though the claims asserted arose under the Fourth and Fifth Amendments, the amendments implicated in Bivens and Davis. Id. at slip op. 8. Instead, the Court stated that:

> [T]hat argument rests on a basic misunderstanding of what our cases mean by a new context. A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized . . . Bivens concerned an allegedly unconstitutional arrest and search carried out in New York City, 403 U. S., at 389; Davis concerned alleged sex discrimination on Capitol Hill, 442 U. S., at 230. There is a world of difference between those claims and petitioners' cross-border shooting claims, where "the risk of disruptive intrusion by the Judiciary into the functioning of other branches" is significant.

Id.

Additionally, the Fourth Circuit has also held that merely citing to the Fourth or Fifth Amendment is insufficient to show that a case does not arise in a "new context". Tun-Cos v. Perrotte, No. 18-1451, 2019 WL 1867819, at *7 (4th Cir. Apr. 26, 2019). In Tun-Cos, the Fourth Circuit held that the plaintiffs' attempt to "wed the Fifth Amendment equal protection claim of

<u>Davis v. Passman</u>, which concerned a Congressman firing his female secretary, with the Fourth Amendment claim of <u>Bivens</u>" was not effective because the plaintiffs' claims of discrimination "bear[s] little resemblance to the three Bivens claims the Court has approved in the past." <u>Id.</u> at *7.

In this case, the Court states that it has construed Plaintiff's claims to be as follows: (1) Defendants Malone, Pilant, and Phillips have denied him access to the administrative remedy process; (2) Defendants have acted with deliberate indifference to his serious medical needs; (3) Defendants used excessive force when placing him in restraints; (4) Defendants have denied him dental care since his arrival at FCI McDowell; (5) Defendants have placed him in the Special Housing Unit ("SHU") in violation of his constitutional rights; (6) Defendants have opened his legal mail in violation of his constitutional rights and BOP policy; and (7) Defendants have denied him visitation from approved visitors in violation of his due process rights. ECF No. 10. These claims simply bear no resemblance to the three recognized <u>Bivens</u> causes of action. As the Supreme Court explained, "even a modest extension [of <u>Bivens</u>] is still an extension." <u>See</u> <u>Abbasi</u>, 137 S. Ct. at 1864. As Plaintiff's claims present a new context, they are subject to the analysis of any "special factors" counseling hesitation in implying a new <u>Bivens</u> remedy.

### b. Alternative remedies and special factors analysis

Once a new context case has been identified, a court must undertake an analysis to determine if the new context case should be recognized under <u>Bivens</u>. <u>Abbasi</u> "clarified what constitutes a 'special facto[r] counselling hesitation.'" <u>Hernandez v. Mesa</u>, __ U.S. __, 137 S.Ct. 2003, 2006 (2017)(quoting <u>Abbasi</u>, 137 S.Ct. at 1857). "'[T]he inquiry,' the Court explain[ed], 'must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.'" <u>Id.</u> (quoting <u>Abbasi</u>, 137 S.Ct. at 1858).

"The absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." Schweiker v. Chilicky, 487 U.S. 412, 421-22 (1988). As discussed below, there are both alternative remedies available and special factors counseling hesitation against extending Bivens to a new cause of action for Plaintiff's claims in this case.

i. Alternate remedies are available

The Supreme Court has made it clear that "when alternative methods of relief are available, a Bivens remedy usually is not." Abbasi, 137 S.Ct. at 1863. As noted below, federal prisoners, including Plaintiff, have distinct alternate remedies available.

*a. Administrative remedies*

An alternate remedy exists in the prison grievance process, which Plaintiff has failed to pursue with regard to his claims. Administrative remedies are a valid alternative to recognizing a new Bivens cause of action. See Gonzalez v. Hasty, 269 F. Supp. 3d 45, 60 (E.D.N.Y. 2017), aff'd, 755 F. App'x 67 (2d Cir. 2018)(BOP's administrative remedies deemed an alternative remedy for prisoner's Fifth Amendment due process rights); Vega v. United States, 881 F.3d 1146, 1154 (9th Cir. 2018)(finding alternative means of relief existed through the BOP's Administrative Remedy Program for alleged violations of First and Fifth Amendment rights); see also Andrews v. Miner, No. 1:14-cv-1842-LSC-HNJ 2017 WL 7688266 *4 (N.D. Ala. Aug. 25, 2017)(finding, post-Abbasi, that the prisoner plaintiff "pursued" a BOP "administrative remedy, albeit unsuccessfully," but the alternative remedy "[n]evertheless . . . weighs against extension of Bivens to First Amendment claims of use of excessive force in retaliation for filing grievances").

In Tun-Cos, the Fourth Circuit discussed the plaintiffs' argument that the alternative remedies available to them did not include monetary damages and often did not redress constitutional violations occurring apart from removal proceedings. Tun-Cos v. Perrotte, No. 18-

1451, 2019 WL 1867819, at *8 (4th Cir. Apr. 26, 2019). The Court found that plaintiffs' argument "misses the point, for the relevant question 'is not what remedy the court should provide for a wrong that would otherwise go unredressed' but instead 'whether an elaborate remedial system ... should be augmented by the creation of a new judicial remedy.'" Id. (citing Bush v. Lucas, 462 U.S. 367, 388, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)); see also Schweiker, 487 U.S. at 421-22 ("The absence of statutory relief for a constitutional violation ... does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation").

The absence of the availability of monetary relief through the BOP's administrative remedy program, therefore, is not a factor for consideration. The remedial system already in place needs no augmentation through the creation of a new judicial remedy. The BOP's administrative remedy program is an avenue of relief that alone is sufficient to preclude the expansion of Bivens in this new context.

*b. BOP standards of employee conduct*

The core purpose of a Bivens action is "deterring individual officers from engaging in constitutional wrongdoing." Correctional Services Corporation v. Malesko, 534 U.S. 61, 74 (2001)("Respondent instead seeks a marked extension of Bivens, to contexts that would not advance Bivens' core purpose of deterring individual officers from engaging in unconstitutional wrongdoing.).

Implying a monetary remedy against individual BOP staff members in this case would likewise not advance Bivens' core purpose of deterring officers from engaging in constitutional wrongdoing. In a case such as this when serious staff misconduct is alleged, administrative consequences for staff such as loss of employment, demotion and discipline, and even the potential of criminal prosecution, are sufficient deterrents to individual federal actors to alleviate

the concern present in <u>Bivens</u> and <u>Carlson</u> that a suit against the United States would be insufficient to deter the unconstitutional acts of individuals. While the Supreme Court in <u>Bivens</u> created a judicial remedy in part to deter individuals from engaging in unconstitutional wrongdoing, following <u>Abbasi</u> and <u>Hernandez</u>, it is clear that Congress, not the judiciary should establish what remedies will best deter individuals from violating the constitutional rights of others.

### c. Habeas and injunctive relief

The Court specifically noted in <u>Abbasi</u>, when discussing the prisoner's allegation of mistreatment, that injunctive or equitable relief might be available to an inmate under habeas. <u>Abbasi</u>, 137 S. Ct. at 1865 (recognizing that alternative remedies usually preclude a court from authorizing a <u>Bivens</u> action and noting that an inmate may have alternative remedies available through a writ of habeas corpus, injunction, or some other form of equitable relief). In this case, such relief would be more effective than a <u>Bivens</u> claim for rectifying Plaintiff's complaints since his allegations relate to his current conditions of confinement and his ongoing medical treatment. <u>See</u> ECF No 4.

### d. State law cause of action

For situations where a law enforcement officer is found to be acting outside the scope of his employment and therefore not covered by the FTCA, there exists a remedy against the officer, specifically that of individual liability under state law. <u>See</u> <u>e.g.</u> <u>Matsko v. U.S.</u>, 372 F.3d 556, 558 n. 5 (3d Cir. 2004)(where FTCA case dismissed because employee acted outside the scope of employment, a state law claim against the individual could proceed in state court).

A state tort law provides an alternative means of relief. <u>See</u> <u>Minneci v. Pollard</u>, 565 U.S. 118, 127-130 (2012)(recognizing availability of remedy of state tort law and that "[s]tate-law

remedies and a potential <u>Bivens</u> remedy need not be perfectly congruent.").   Thus, the availability of a state remedy also counsels hesitation in creating a new <u>Bivens</u> cause of action.

Because there are alternative remedies available to recognizing a new cause of action under <u>Bivens</u>, the Court should follow the Supreme Court's clear guidance and not recognize this new context <u>Bivens</u> action.

### ii. Special factors counseling hesitation

In addition to the alternative remedies available, there are special factors that weigh against the creation of a new <u>Bivens</u> claim.

#### a. Separation of powers and congressional intent

In the case at hand, one special factor counseling hesitation in expanding <u>Bivens</u> is Congress' involvement in prison litigation matters.   "Congress has legislated in the arena of prisoner rights, suggesting that the courts should not extend a damages remedy in this sphere."[6] <u>Morgan</u>, 2018 WL 618451 at *6; Significant in the Congressional passage of the PLRA is "the general scheme of the PLRA" which in part "attempts to eliminate unwarranted federal-court interference with the administration of prisons . . . ." <u>Woodford v. Ngo</u>, 548 U.S. 81, 93 (2006).

The PLRA enacted a variety of reforms, including provisions relating to prospective relief in civil actions arising under federal law challenging conditions in prison (18 U.S.C. § 3626); limitations on a prisoner's recovery for mental or emotional injuries (42 U.S.C. § 1997e(e)); provisions for the *sua sponte* dismissal of prisoner cases for failure to state a claim

---

[6] It is clear the Supreme Court strongly disfavors the further extension of <u>Bivens</u> into *any* sphere. The concurrence in <u>Hernandez</u> goes as far as to state: "[T]he time has come to consider discarding the <u>Bivens</u> doctrine altogether. The foundation for <u>Bivens</u>—the practice of creating implied causes of action in the statutory context—has already been abandoned. And the Court has consistently refused to extend the <u>Bivens</u> doctrine for nearly 40 years, even going so far as to suggest that <u>Bivens</u> and its progeny were wrongly decided. Stare decisis provides no "veneer of respectability to our continued application of [these] demonstrably incorrect precedents." <u>Gamble v. United States</u>, 587 U. S. ___, ___ (2019)(THOMAS, J., concurring)(slip op., at 2). To ensure that we are not "perpetuat[ing] a usurpation of the legislative power," id., at ___ (slip op., at 9), we should reevaluate our continued recognition of even a limited form of the Bivens doctrine." <u>Hernandez</u>, 589 U.S. at __ (Thomas, J., concurring)(slip op., at 1).

(42 U.S.C. § 19971e(c)); limitations on attorney fees in prisoner cases (42 U.S.C. § 1997e(d)); directing that prisoner hearings be held to the extent practicable by telephone, video conference, etc. (42 U.S.C. § 1997e(f)); and providing a prison defendant the right to waive a reply to actions brought by prisoners (42 U.S.C. § 1997e(g)).

Despite the PLRA's sweeping reform, Congress did not provide a damage remedy to prisoners for constitutional claims.[7] The inaction by Congress to extend damage remedies after Carlson is a special factor counseling hesitation in recognizing this case as a new implied cause of action under Bivens.  See Gonzalez v. Hasty, 269 F. Supp. 3d 45, 61 (E.D.N.Y. 2017), aff'd, 755 F. App'x 67 (2d Cir. 2018)(addressing the issue whether to address a damage remedy against individual officers, referred to Congress enacting the PLRA, and stating "there is very good support for the conclusion that Congress does not want a Bivens remedy in this context"); see also Tun-Cos, 2019 WL 1867819, at *8 (using similar reasoning to find "Congress's legislative actions in this area persuasively indicate that Congress did not want a money damages remedy against ICE agents for their allegedly wrongful conduct, as indicated by its frequent amendment of the INA and its repeated refusal to provide a damages remedy.").

### b.  Separation of powers and executive review

In Hernandez, the Supreme Court found it relevant that the executive agency involved had conducted an investigation of the Agent named as a Bivens defendant, and:

> [T]he Executive decided not to take action against Agent Mesa because it found that he "did not act inconsistently with [Border Patrol] policy or training regarding use of force." We presume that Border Patrol policy and training incorporate both the Executive's understanding of the Fourth Amendment's prohibition of unreasonable seizures and the Executive's assessment of circumstances at the border.  Thus, the Executive judged Agent

---

[7] It is also worth noting that no damages remedy for constitutional claims was included in the recently enacted First Step Act, S. Res. 756 – 115th Congress (2017–2018)(enacted), another comprehensive act addressing many aspects of the federal prison system.

> Mesa's conduct by what it regards as reasonable conduct by an
> agent under the circumstances that Mesa faced at the time of the
> shooting, and based on the application of those standards, it
> declined to prosecute. The Executive does not want a . . . jury in a
> Bivens action to apply its own understanding of what constituted
> reasonable conduct by a Border Patrol agent under the
> circumstances of this case. Such a jury determination, the
> Executive claims, would risk the ""embarrassment of our
> government abroad" through "multifarious pronouncements by
> various departments on one question.""

Hernandez, 589 U.S. at ___ (slip op. at 9-10)(internal citations omitted). This highlights the importance of recognizing that, not only does Congressional intent need to be considered by the Courts when determining if a remedy is appropriate under Bivens, but the role of the Executive agency should also be considered. The Department of Justice and the BOP's policies and training take into account the Executive's understanding of constitutional, statutory, and regulatory law. To subject that process to review by the Court and by a Jury would be an inappropriate intrusion into the functions of the Department of Justice, who has been delegated these duties by the Attorney General of the United States. 18 U.S.C. § 4042.

Furthermore, regarding Plaintiff's claims relating to his placement in SHU and conditions of his confinement, to subject the interpretation and application of the BOP's understanding of its officers' duties and obligations under the Constitution to judicial or jury review would be an inappropriate intrusion into the BOP and the prison management responsibilities that have been delegated to the BOP.

### c. Systemwide costs

Abbasi further instructs that "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide." 137 S. Ct. at 1858. The systemwide costs include "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself . . . ." Id. These burdens

and costs are particularly high in the prison setting. The burdens on the government, the prison administration, and on the individual employees, who must defend claims often filed without merit and simply for harassment, are great. Specifically, being named in a frivolous law suit can cause financial problems for Defendants and their families who then face difficulties refinancing or taking out home loans or other credit due to being involved in a pending legal matter. Furthermore, the representation process for Defendants can be stressful as it involves scrutiny of each Defendant's employment file as well as their overall job performance and interaction with the Plaintiff. Furthermore, Defendants often have to come in on different shifts or on their days off to address issues in the law suit or to consult with their counsel. Finally, there is the general stress and uncertainty caused for each Defendant as they are dragged through these law suits that often take months or even years to resolve, even when it becomes clear through review of the case that the claims are ultimately meritless, frivolous, and maliciously filed for harassment.

Moreover, matters involving prison administration are rarely a proper subject for judicial intervention. "[P]rison officials have broad administrative and discretionary authority over the institutions they manage . . . ." Hewitt v. Helms, 459 U.S. 460, 467 (1983)(receded from by Sandin v. Connor, 515 U.S. 472 (1995) on unrelated grounds). No matter the context, the "administration of a prison is 'at best an extraordinarily difficult undertaking.'" Hewitt, 459 U.S. at 467 (quoting Wolff v. McDonnell, 418 U.S. 539, 566 (1974)).

Permitting this suit and similar suits to proceed under Bivens would have a drastic negative impact on the governmental operations of the BOP system wide. The burdens on the employees who are sued in their personal capacity, as well as the costs and consequences to the United States and the BOP from such suits, is evidence that special factors counsel against the extension of Bivens into this area.

*d. Harmful effect on discharge of duties*

Finally, the Court should consider the harmful effect the creation of a <u>Bivens</u> remedy in this context would have on the discharge of official duties. Officials "who face personal liability for damages might refrain from taking urgent and lawful action in a time of crisis." <u>Abbasi</u>, 137 S. Ct. at 1863. In the context of the <u>Hernandez</u> case, the Supreme Court stated, "[t]he United States has an interest in ensuring that agents assigned the difficult and important task of policing the border are held to standards and judged by procedures that satisfy United States law and do not undermine the agents' effectiveness and morale." <u>Hernandez</u>, 589 U.S. ___ at ___ (slip op. 11).

In the prison context, safety and security are paramount and require staff to make split-second decisions without hesitation. It is imperative to the safety and security of inmates, staff, the public, and the orderly running of the institution that BOP staff members do not face constant attacks against them in their personal capacity for discovering and acting upon inmate misconduct and criminal conduct. Regarding placing inmates in SHU, staff could be discouraged from exercising their sound correctional judgment to place inmates in SHU for safety and security purposes. Permitting suits such as this one to proceed would cause the Supreme Court's concern to be realized: the effectiveness and morale of BOP staff members would indeed be undermined. Because special factors counsel hesitation in this case, the Court should not recognize a <u>Bivens</u> cause of action for any of Plaintiff's claims.

## D. Plaintiff has not Sufficiently Pled a Cause of Action for Any Constitutional Violation

Having addressed major jurisdictional and procedural defects in Plaintiff's Complaint, Defendants now address the insufficiency of Plaintiff's Complaint in failing to assert any grounds for which relief could be granted against any named Defendant.

The Court states that it has construed Plaintiff's claims to be as follows: (1) Defendants Malone, Pilant, and Phillips have denied him access to the administrative remedy process; (2) Defendants have acted with deliberate indifference to his serious medical needs; (3) Defendants used excessive force when placing him in restraints; (4) Defendants have denied him dental care since his arrival at FCI McDowell; (5) Defendants have placed him in SHU in violation of his constitutional rights; (6) Defendants have opened his legal mail in violation of his constitutional rights and BOP policy; and (7) Defendants have denied him visitation from approved visitors in violation of his due process rights. ECF No. 10. Each of these claims will be addressed in turn.

### a. Dismissal of the Complaint Pursuant to Fed. R. Civ. P. 8 is Appropriate

The Federal Rules of Civil Procedure require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009). A properly pleaded complaint provides to an opponent "illumination as to the substantive theory under which [plaintiff] [i]s proceeding, which is the function of pleadings under the Federal Rules." Atl. Purchasers, Inc. v. Aircraft Sales, Inc., 705 F.2d 712, 717 (4th Cir. 1983).

While the court should construe *pro se* pleadings generously, it must "exhibit awareness of the defendant's inalienable right to know in advance the nature of the cause of action being asserted against him." Rodriquez v. Doral Mortgage Corp., 57 F.3d 1168, 1171 (1st Cir. 1995)(citing Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506 (1959), Conly v. Gibson, 355 U.S. 41, 47 (1957)).

Even construed liberally, Plaintiff's Amended Complaint is unclear about what the allegations are against the named defendants. ECF No. 37. It is not organized by event or date.

Id. In fact, it is hard to imagine a pleading more completely at variance with the letter and the spirit of Rule 8 (e)(1), which requires that a pleading be simple, concise, and direct. See Martin v. Hunt, 29 F.R.D. 14, 15-16 (D. Mass. 1961). As a practical matter, neither Defendants nor this Court should be expected to unravel it to determine what the specific allegations are against each individual defendant when it is unclear. See Newman v. Com. of Mass., 115 F.R.D. 341, 344 (D. Mass. 1987)(lengthy, detailed complaint both wastes the court's time and makes the defendants' task in answering unnecessarily difficult).

### b. No constitutional right to file administrative remedies

Defendants will first address Plaintiff's claim that he has been denied access to the administrative remedy process. Legally frivolous claims are based on an "indisputably meritless legal theory" and include "claims of infringement of a legal interest which clearly does not exist." Neitzke v. Williams, 490 U.S. 319, 327, 109 S. Ct. 1827, 1833, 104 L. Ed. 2d 338 (1989). The law is clear that inmates have no constitutional right to participate in a prison's grievance process. Lancaster v. Todd, No. 1:16CV200, 2017 WL 4278785, at *2 (N.D.W. Va. Sept. 27, 2017), aff'd, 710 F. App'x 168 (4th Cir. 2018); Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994).

Additionally, as stated above, Plaintiff's ability to file the instant civil suit as well as to continue to file documents with the Court weighs against finding that he has been deprived of access to administrative remedies as was held by this Court in Hancock v. Rickard, et al., 1:1-cv-00024, pg. 20 (Faber, March 30, 2020), where an inmate made similar allegations related to access to administrative remedies. Accordingly, these claims against Defendants Malone, Pilant, and Phillips should be dismissed.

### c. Handling of legal mail [8]

Relating to his claims that his legal mail was opened outside of his presence on a few occasions, it is true the United States Constitution guarantees inmates the right of meaningful access to the courts, which encompasses issues regarding inmate legal mail. See Bounds v. Smith, 430 U.S. 817, 821 (1977). In Lewis v. Casey, 518 U.S. 343, 349 (1996), however, the Supreme Court held that a prisoner must show some actual injury resulting from a denial of access in order to allege a constitutional violation. This requirement can be satisfied by demonstrating that a non-frivolous legal claim was frustrated or impeded by some actual deprivation of access. Id. at 352-53. A claim for failure to provide access to courts must be pleaded with specificity. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996). Moreover, "a few instances of opening legal mail outside of the presence of the inmate does not indicate a constitutional violation." Wise v. Samuels, 2014 WL 1280975, at *3 (E.D. Va. Mar. 26, 2014)(citing Buie v. Jones, 717 F.2d 925, 926 (4th Cir. 1983)).

Here, Plaintiff has failed to plead with specificity any actual injury related to the alleged mishandling of his legal mail. [9] He has not shown that he was unable to proceed with any action or that his claims were non-frivolous so as to establish a constitutional violation in relation to the alleged mail mishandling. [10] ECF No. 4.

---

[8] The issue of legal mail has previously been resolved. However, this section is included to specifically address the allegation in the Complaint.

[9] Plaintiff's allegations regarding mishandling of his legal mail would amount to a mere BOP policy violation if true, and is not a constitutional violation. See Terrell v. Rupert, No. 7:11-CV-00024, 2011 WL 6046618, at *6, Turk, J. (W.D. Va. Dec. 5, 2011), aff'd, 471 F. App'x 206 (4th Cir. 2012)("As a preliminary matter, the Court notes that the violation of BOP guidelines does not create a constitutional violation, as required for a Bivens claim.").

[10] Plaintiff's mail has not been mishandled. Rather, the incoming mail was not properly marked and was therefore treated as general correspondence by BOP staff pursuant to policy.

### d. Excessive force claims

Plaintiff's Complaint fails to state a claim of excessive force. Plaintiff states without any additional information regarding dates or times,[11] that he had a seizure and states that Defendant Cook responded. See ECF No. 37. Plaintiff further on states that he was pulled out of his cell, cuffed behind his back, flipped in the air and slammed down on a gurney, and then left in a painful position with the cuffs breaking and bruising his skin for two hours. See ECF No. 37. He does not specify what actions Defendant Cook is supposed to have taken in this ordeal. See id. He does not state that Defendant Cook participated in any of this, only that Defendant Cook made the statement that Plaintiff was on drugs.[12] See id. Mere verbal harassment does not give rise to a constitutional violation. Wagner v. Wheeler, 13. F. 3d 86, 92–93 (4th Cir. 1993); see also, Lancaster v. Todd, No. 1:16CV200, 2017 WL 4278785, at *2 (N.D.W. Va. Sept. 27, 2017), aff'd, 710 F. App'x 168 (4th Cir. 2018)(holding that plaintiff's allegations that BOP employees cursed at him and used racial slurs did not state a viable claim for retaliation.).

Should the Court construe Plaintiff's Complaint to state a claim against Defendant Cook for excessive force, "Whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments clause, the core judicial inquiry is . . . whether

---

[11] While there is documentation that Plaintiff was placed in SHU on September 23, 2019 for suspected use of narcotics, it is not Defendants' responsibility to fill in the gaps of Plaintiff's Complaint where Plaintiff was not clear, especially where there is no medical or other documentation suggesting Plaintiff suffered any of the alleged injuries on that date. In fact, medical records from an assessment conducted September 24, 2019, state that Plaintiff reported no injuries, that his skin was dry and intact, that Plaintiff was in no apparent distress, and that no injuries were noted. See Defendants' Exhibit 3, Declaration of Kevin Thompson, Attachment A, Medical Records.

[12] Regarding Plaintiff's allegations that this was not true, inmates have no constitutional right prohibiting false disciplinary charges against them potentially impacting their liberty interests. Johnson v. Johnson, No. CV 1:17-00608, 2018 WL 4374231, at *11 (S.D.W. Va. June 5, 2018), report and recommendation adopted, No. CV 1:17-00608, 2018 WL 3629822 (S.D.W. Va. July 31, 2018); Freeman v. Rideout, 808 F.2d 949, 951 (2nd Cir. 1986)("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."). Rather, inmates have the right to refute such charges utilizing the procedural due process protections enunciated in Wolff v. McDonnell.

force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992)(internal quotation marks and citations omitted). In determining whether the use of force by a prison official was proper, courts are to consider "the extent of [the] injury suffered," "the need for [the] application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Id. In this case, while Plaintiff alleges he suffered bruising and his wrists were cut to the bone, nothing in his medical records suggest he suffered such injuries at any point in time. See Defendants' Exhibit 3, Attachment A. If Defendant Cook did engage in the use of force in response to Plaintiff's suspected drug use, there is no evidence or allegations that his specific actions amounted to a violation of his constitutional rights. See ECF No. 37. There is no information in the pleadings that Cook specifically acted in a sadistic or malicious manner to cause harm-stating that Plaintiff was on drugs is not sufficient-in fact, Cook's belief that Plaintiff was suffering from drug intoxication demonstrates his perception that a degree of force was necessary to respond to Plaintiff's behavior with a good faith effort to maintain or restore discipline. See id. Accordingly, the claims of excessive use of force against Defendant Cook must be dismissed.

### e. Placement in special housing

Plaintiff's allegation that he was wrongfully placed in SHU fails to amount to a constitutional violation since an inmate has no liberty interest in avoiding confinement in administrative segregation. See Beverati v. Smith, 120 F.3d 500, 502-04 (4th Cir. 1997); Sandin v. Conner, 515 U.S. 472 (1995).

Furthermore, Courts in the Fourth Circuit have long recognized that the Constitution confers no protected liberty interest upon inmates from being placed in a particular prison or

even in administrative segregation. See Ajaj v. Smith, 108 Fed. Appx. 743, 744, 2004 WL 1663968 (4th Cir.2004)("To the extent that Ajaj complained about his transfer to Colorado, the Bureau of Prisons has discretion to determine where and under what conditions a federal prisoner is housed. Further, Ajaj did not have a protected liberty interest in remaining at FCI–Edgefield."); Neal v. Shimoda, 131 F.3d 818, 828 (9th Cir.1997)("A prisoner does not have a constitutional right to be housed at a particular institution ... [or] to receive a particular security classification").

Accordingly, Plaintiff's placement in SHU[13] is a matter for BOP officials' discretion whose exercise is not subject to federal procedural due process constraints.

### f. Plaintiff's claims regarding visitation are without merit

Plaintiff claims he has been wrongfully denied visitation from his fiancé. Inmates wishing to have a visitor added to their approved visitation list must work with the visitor to complete forms for submission to the inmate's Correctional Counselor. See Defendant's Exhibit 1. The Correctional Counselor will review the request and conduct an investigation into the requested visitor to ensure the individual does not have certain characteristics in their background such as a recent criminal conviction or a history of attempting to introduce contraband into a prison. See id. There is no time limit on how long this investigation can take. See id.

---

[13] Regarding Plaintiff's complaints of the conditions of SHU such as receiving cold food, being subject to cold temperatures, not having access to commissary, etc., none of these claims amount to a constitutional violation. See, e.g., Tokar v. Armontrout, 97 F.3d 1078, 1083 (8th Cir. 1996)(stating that "we know of no constitutional right of access to a prison gift or snack shop"); Strickler v. Waters, 989 F.2d 1375, 1382 (4th Cir. 1993)(no Eighth Amendment violation based upon cold temperatures where prisoner was provided with blankets); Shannon v. Graves, No. CIV.A.98-3395-KHV, 2000 WL 206315, *11 (D. Kan. Jan. 5, 2000)(fact that inmate is served spoiled food on occasion and food with insect on one occasion insufficient to find cruel and unusual punishment).

Additionally, the Supreme Court has held that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Wilson v. Seiter, 501 U.S. 294, 305 (1991). The Court confirmed that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." Id. at 304.

In this case, Plaintiff submitted a request for an individual he identified as his fiancée to be added to his visitation list.  See id., Attachment D, Visiting List.  That individual was approved and placed on Plaintiff's approved visitor list on January 14, 2020 by Defendant Malone.  See id.

Regardless, a claim that an inmate has been denied visitation is without merit.  It is well established that an inmate has no absolute right to prison visitation or telephone privileges.  See Redman v. Kilgore, No. CIV.A. 5:08-0881, 2011 WL 830060, at *5 (S.D.W. Va. Jan. 14, 2011), report and recommendation adopted, No. 5:08-CV-00881, 2011 WL 837759 (S.D.W. Va. Mar. 4, 2011)(holding that inmate's claim that his liberty interest in retaining visitation was violated was without merit); Kentucky Department of Corrections v. Thompson, 490 U.S. 454, 109, S.Ct. 1904, 104 L.Ed.2d 506 (1989)("The denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence and therefore is not independently protected by the Due Process Clause."); Alkebulanyahh v. Ozmint, 2009 WL 2043912, *9 (D.S.C. July 13, 2009), aff'd, 358 Fed. Appx. 431 (4th Cir.2009)("[P]rison visitation does not implicate the standard set forth in Sandin."); Ozolina v. Durant, 1996 WL 82481, *1 (E.D.Pa. Feb. 26, 1996)(Under Sandin, "there is no right to visitation protected by the Due Process Clause."); White v. Keller, 438 F.Supp. 110, 114 (D.C.Md.1997), aff'd, 588 F.2d 913 (4th Cir.1978)("[T]here is no constitutional right to prison visitation, either for prisoners or visitors").

Accordingly, even amending his Complaint further would not remedy the fact that Plaintiff has no liberty interest in visitation.  This claim, therefore, should be dismissed.

### g.  Retaliation

Legally frivolous claims are based on an "indisputably meritless legal theory" and include "claims of infringement of a legal interest which clearly does not exist." Neitzke v.

Williams, 490 U.S. 319, 327, 109 S. Ct. 1827, 1833, 104 L. Ed. 2d 338 (1989).  It follows that claims of retaliatory actions are legally frivolous unless the complaint implicates some right that exists under the Constitution.  See Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994).  Accordingly, plaintiffs must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right.  Id. A claim of retaliation that fails to implicate any constitutional right "lacks even an arguable basis in law," and is properly subject to dismissal under § 1915(d).  Id.; Neitzke, 490 U.S. at 328, 109 S.Ct. at 1833.

Plaintiff has not implicated any constitutional rights in his allegations of retaliation.  See ECF No 37.  Plaintiff's bare assertions, coupled with his failure to show adversity, requires dismissal of his retaliation claims.  See ACLU of Maryland v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993)("Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation.  Thus, a showing of adversity is essential to any retaliation claim.").

### h. Conspiracy

Similar to Plaintiff's retaliation claim, Plaintiff's conspiracy claims is also derivative of and dependent upon him establishing an underlying constitutional violation.  See Lee v. Director, Fed. Bureau of Prisons, et al., 2009 WL 2060116, fn. 4 (S.D. W.Va. July 8, 2009).  Additionally, to state a claim of conspiracy, a plaintiff must allege (1) that the defendant(s) engaged in a conspiracy; (2) for the purpose of depriving, either directly or indirectly, the plaintiff or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws; (3) the person(s) acted in furtherance of the conspiracy; (4) and the plaintiff suffered injury in his person or property or deprivation of a right or privilege of a citizen of the United States. Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir.1995).

In this case, Plaintiff has not shown a constitutional violation, and he has not shown prejudice or injury. Because Plaintiff has stated only bare assertions that Defendants have engaged in a conspiracy and he has not shown that he has suffered any injury or constitutional violation, his conspiracy claims must be dismissed.

### i. Discrimination

The Equal Protection Clause affords that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1982). However, the Plaintiff must allege facts to show that he was treated differently from other "similarly situated" inmates. Further, the Plaintiff must allege facts to show discriminatory intent or purpose, not merely discriminatory impact. Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). To meet this requirement, a plaintiff is required to set forth "specific, non-conclusory factual allegations that establish improper motive." Williams v. Hansen, 326 F.3d 569, 584 (4th Cir. 2003).

Plaintiff has not alleged any specific facts that would demonstrate that he has been treated differently than other inmates who are similarly situated. See Murray v. Matheney, No. 2:13-CV-15798, 2015 WL 4459177, at *13 (S.D.W. Va. July 20, 2015). His claims that staff members have wrongly accused him of being intoxicated from the use of illicit substances in the past is not sufficient. Accordingly, Plaintiff's discrimination claims against all Defendants are insufficient on their face and must be dismissed.

### j. Lack of personal involvement

The purpose of Bivens liability is to "deter individual federal officers from committing constitutional violations." Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70, 122 S. Ct. 515, 521,

151 L. Ed. 2d 456 (2001). Bivens liability is personal, based upon the specific conduct of each individual defendant. Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001)(citations omitted).

Therefore, where a Bivens defendant is sued in his supervisory capacity, he is not vicariously liable for the misconduct of subordinate employees. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Nonetheless, a supervisor may be directly liable where he deliberately ignores or tacitly approves of subordinate misconduct. Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir.1990)(reversed on other grounds). However, absent some supporting factual detail, vague allegations that a supervisor was aware of subordinate misconduct are not sufficient to state a valid Bivens claim. See Patel v. Moron, 897 F. Supp. 2d 389, 401 (E.D.N.C. 2012).

Here, Plaintiff names Warden Maruka,[14] Associate Warden Rich, Captain Munn, Unit Manager Pilant, Human Resources Specialist Marsh, and Health Services Administrator Thompson solely due to their supervisory positions at FCI McDowell. See ECF No. 37. Plaintiff has not established the requisite personal or supervisory involvement necessary to support Bivens liability for these Defendants, and they are entitled to be dismissed from this action.

Furthermore, looking at the specific allegations as construed by the Court at ECF Doc. 10, the only Defendants named in relation to the first allegation regarding access to administrative remedies are Pilant, Malone, and Phillips. See ECF No. 37. In reviewing the Amended Complaint, the only Defendants named in relation to his medical claims are BOP Health Services staff members Walters, Wyatt, Alexander, and Carothers. See id. In relation to Plaintiff's excessive force claims, the only Defendant named in relation to these allegations is

---

[14] Plaintiff's allegation that Warden Maruka lied to Plaintiff about his identity, even if true, does not amount to an action that violated Plaintiff's constitutional rights. No other specific actions are alleged against Warden Maruka. See ECF No. 4.

Cook.[15]  See id.  Regarding Plaintiff's dental claims, he did not name a single Defendant to whom he alleges he reported his issues or who took action to deny him access to dental care, so no Defendants are implicated in these claims.  See id.  Related to his claims that he has been wrongfully placed in SHU, there are again no specific Defendants named.  See id.  The only Defendant involved in Plaintiff's claims regarding his legal mail is Green.  See id.  Finally, the only Defendants named in relation to Plaintiff's visitation claims are Malone and Pilant.  See id.

In the alternative, should the court construe any of plaintiff's bare allegations as statements of personal involvement, defendants assert the conduct does no rise to a violation of the constitution as previously discussed. For example, plaintiff asserts that Marsh failed to act on his complaints. Yet, plaintiff concedes that Marsh returned to plaintiff's cell to admonish him for lying. Marsh, according to plaintiff, did take action on plaintiff's complaints and was informed that plaintiff's complaints were already being considered by other staff members. Such actions, if construed as allegations of misconduct do not arise to the level of a constitutional violation.

Accordingly, Defendants Maruka, Thompson, Saunders, Kendrick, Horton, Rich, Shrader, Marsh, and Munn have not been named in connection with any of the surviving claims and must be dismissed from this action for lack of personal involvement.

### k.    Defendants named in their official capacities

In his Complaint, Plaintiff indicates he is suing the named Defendants in their official capacities.  ECF No. 37.  However, Defendants named in their official capacities as employees with the Bureau of Prisons are not proper Defendants to this action.  Rather, the proper defendant in a suit against a government employee in his or her official capacity is the United States.  Connor v. Matthews, 134 F. Supp. 2d 797, 799 (N.D.Tex. 2001).  The United States, however,

---

[15] Defendant Cook asserts that Plaintiff's claims are not pled with sufficient specificity to put him on notice as to what actions he is alleged to have taken that amounted to a violation of Plaintiff's constitutional rights.

has not waived its sovereign immunity for constitutional torts asserted against federal agencies or the directors of those agencies in their official capacity. FDIC v. Meyer, 510 U.S. 471, 476 (1994) (citing Loeffler v. Frank, 486 U.S. 549, 554 (1988)) (citations omitted); Federal Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 484-85, 114 S.Ct. 996, 1005-06 (1994); see also Hatten v. White, 275 F.3d 1208, 1210 (10th Cir. 2002) (federal employees in official capacities immune from Bivens suit); Pickens v. Fed. Bureau of Prisons, No. 96-1246, 1997 WL 271326 (10th Cir. May 22, 1997) (no Bivens action against United States or its agencies for compensatory damages). Accordingly, absent a waiver of sovereign immunity, the Court must dismiss Plaintiff's Bivens claims against Defendants in their official capacities.

### E. Plaintiff's Medical Claims

Plaintiff alleges he has not received adequate medical treatment since his arrival at FCI McDowell. To establish an actionable Eighth Amendment claim for inadequate medical care, a claimant must demonstrate the defendants were deliberately indifferent to his serious medical needs. Wilson v. Seiter, 501 U.S. 294, 297 (1991). This inadequate medical care standard is comprised of both an objective and a subjective component. The objective component asks whether an alleged deprivation is sufficiently serious to constitute an Eighth Amendment violation. Wilson v. Seiter, 501 U.S. at 298, 111 S. Ct. at 2324; Estelle v. Gamble, 429 U.S. 97, 104 (1976). The subjective component is concerned with a defendant's culpable state of mind, specifically, whether the prison official acted with deliberate indifference to a prisoner's medical needs. Hudson v. McMillian, 503 U.S. 1, 9 (1992).

#### a. The Objective Component

"[S]ociety does not expect that prisoners will have unqualified access to health care . . . ." Hudson, 503 U.S. at 9. Therefore, to establish an Eighth Amendment violation, a prisoner must show the medical need is serious. Hudson, 503 U.S. at 9 (referencing Estelle v. Gamble, 429

U.S. at 103-104 and <u>Farmer v. Brennan</u>, 511 U.S. 825, 834, 1977 (1994)). What suffices as a serious medical need is one that "is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." <u>Martin v. Bowman</u>, 48 F.3d 1216 (4th Cir. 1995)(quoting <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990)).

The Fourth Circuit has proceeded one step further under the objective component analysis by requiring not only that the condition be serious, but also that a prisoner provide evidence that his condition was not timely or properly treated. <u>Harden v. Green</u>, 27 Fed. Appx. 173, 178 (4th Cir. 2001)("The objective element also requires [the prisoner] to prove that his serious medical need was not timely or properly treated."); <u>Clinkscales v. Pamlico Correctional Facility Medical Dept.</u>, No. 00-6798, 2000 WL 1726592 *1 (4th Cir. Nov. 21, 2000).

Assuming for purposes of this motion only that Plaintiff's medical complaints are objectively sufficiently serious, Plaintiff cannot satisfy the objective component of the Eighth Amendment analysis, as Plaintiff cannot show that his medical condition was not timely or properly treated. [16]

i. <u>Inmate access to medical care-procedures</u>

To ensure the orderly functioning of the Health Services Department at FCI McDowell, the institution has established procedures for inmates to request medical and dental appointments. <u>See</u> Defendants' Exhibit 3. This procedure is outlined in the institutional Admissions and Orientation Handbook provided to each inmate upon arriving at the institution

---

[16] Because Plaintiff cannot show that his condition was not timely or properly treated for purposes of the objective component, and because Plaintiff cannot establish deliberate indifference necessary for the subjective component, it is assumed for purposes of this motion only that Plaintiff's medical condition was sufficiently serious for purposes of an Eighth Amendment claim. Defendants reserve the right to raise the issue of whether Plaintiff's injury was sufficiently serious for Eighth Amendment purposes, should the need arise.

and also available for review at the institution's library.  See id., Attachment B, Admissions and Orientation Handbook.

Inmates in general population wishing to be seen by medical or dental staff are directed to bring their ID card to the Health Services Department during the morning sick-call move.[17]  See id.  Appointments are made by coming to the Health Services Department during this time.  See id.  The inmate must present his ID card along with his sick call form at the sign-up desk.  The form must include the inmate's name, register number, and complaint details.  See id.

Once a sick call request is received from an inmate, Health Services staff members will log the request and determine whether the inmate should be seen immediately or if the inmate will be placed on the call-out list for a later date and time for an appointment.  See id.  This determination is made based on the nature of the complaint.  See id.

For inmates in SHU, medical staff make rounds in the SHU a minimum of two times per day.  See id.  The first round is conducted at 6:00 - 6:30 AM, and the second visit occurs during the evening after the count clears (generally around 6:30 PM).  See id.  It is the inmate's responsibility to be standing at their door during the morning rounds in order to request a sick call visit.  See id.  Depending on the nature of the inmate's complaint, an appointment will be made at the appropriate time.  See id.  Sick call requests are accepted on Monday, Tuesday, Thursday, and Friday.  See id.

Regarding requests for dental treatment, inmates at the FCI who wish to have a dental cleaning must submit an Inmate Request to Staff Member (Cop-out).  See id.  The inmate is then placed on a waiting list and advised of the approximate date of his scheduled appointment.  See id.

---

[17] This is the first move of the morning, four days per week: Monday, Tuesday, Thursday, and Friday, except for holidays.  See id.

If an inmate is experiencing a medical emergency, including a dental emergency, they are to report the emergency to the closest staff member, who will then contact Health Services for further instructions and assistance.[18] See id.

Plaintiff's records from FCI McDowell reflect that he had submitted only one sick call request and no dental sick call requests at the time of the filing of the Second Amended Complaint.[19] See id. However, Plaintiff has been seen several time by health services in relation to other events as described below.

## ii. Plaintiff's medical history

When Plaintiff initially arrived at FCI McDowell, an intake medical screening was conducted. See id., Attachment E, Relevant Medical Records. This occurred on July 23, 2019. See id. During the screening, Plaintiff informed medical staff that he had a history of seizures. See id. He stated that they are sporadic and there is no real trigger. See id. He reported that he experienced several small seizures a year that he did not report to medical. See id. He also stated that he had had a fractured right temporal lobe and fractured neck spinal process from a fight that occurred in prison in July of 2007. See id.

On September 24, 2019, Plaintiff was seen by medical in the SHU. See id. He reported that he had had a seizure the previous night on September 23, 2019. See id. Reports from BOP staff indicated that on September 23, 2019, at 7:23 pm., a medical emergency was announced in the B-4 housing unit. See id. Specifically, Plaintiff was observed to be incoherent and rolling on the floor in cell 229 with a homemade smoking pipe in his hand. See id. When examined by

---

[18] In addition to the information provided to inmates in the Admissions and Orientation Handbook, Plaintiff's medical records indicate he has been provided education and counseling on at least six occasions regarding how to access health care at FCI McDowell. See id.

[19] Plaintiff made his one sick call request on February 4, 2020. See id.

medical the following day, Plaintiff did not appear to be in distress, and no injuries were noted. See id.  Plaintiff had no complaints at the time of the encounter.  See id.

On October 29, 2019, Plaintiff was again seen by medical in the SHU following suspected narcotic use.  See id.  At the time of the encounter, Plaintiff denied injury, and no signs of distress were noted.  See id.

Plaintiff was next seen by medical on December 5, 2019.  See id.  During that encounter, Plaintiff reported no injury or pain.  See id.  It was noted that he was alert and oriented, that no apparent distress was noted, that he denied any fights/altercations/injuries, and that he was ambulatory without difficulty.  See id.

On December 9, 2019, Plaintiff was the subject of an emergency medical call.  See id. An officer observed Plaintiff fall down and hit his head on a bunk in his cell.  See id.  Medical staff responded to the emergency, and upon arrival, staff noted that the cell where Plaintiff was located had a strong smell of smoke.  See id.  Plaintiff was lying on the cell floor unresponsive to verbal commands but breathing.  See id.  Plaintiff was placed in a c-collar for his safety.  See id. While staff was retrieving the backboard to transport Plaintiff out of the cell, Plaintiff became combative, kicking and trying to bite staff.  See id.  Once Plaintiff was transported to medical, he responded to a sternal rub by opening his eyes.  See id.  Eventually, he was able to say his first name.  See id.  Based on staff observations, it was believed Plaintiff was suffering from the toxic effects of ingesting an unknown substance.  See id.  Medical staff had Plaintiff sent to the Emergency Room for further evaluation.  See id.

The next day, December 10, 2019, Plaintiff returned from the hospital to the institution. See id.  He was seen in medical, and he reported no complaints or pain.  See id.  He further denied any problems during the medical trip.  See id.

On January 1, 2020, Plaintiff was seen in medical because he was observed by staff to have an altered mental status.  See id.  He was observed in the unit to be on the floor shaking his arms.  See id.  When found, Plaintiff was breathing.  See id.  When he was transported to medical, it was noted that a narcotic overdose was suspected.  See id.  Specifically, Plaintiff's pupils had a sluggish response to light.  See id.  Medical staff decided to give Plaintiff a dose of Narcan[20] to counteract the potential effects of an overdose.  See id.  After the Narcan was given, Plaintiff did become more aware, and he was able to speak some.  See id.  He stated that he had a seizure and that medical staff did not believe him.  See id.  After that, Plaintiff would only look at the nurse in response to verbal stimuli, and he would not talk or answer questions.  See id.  It was determined that Plaintiff should be sent to the hospital for further evaluation.  See id.

On January 6, Plaintiff was seen for a medical trip return encounter in Health Services. See id.  At that time, he reported that he was experiencing throbbing lower back pain, and he rated his pain as a 10 on a scale of 1-10.  See id.  He stated he was unsure of when the pain started but that it had been approximately 3-5 days.  See id.  Plaintiff also showed medical staff one area on his hip and one area on his anterior thigh that were bruised.  See id.  Plaintiff stated the bruises were from a seizure.  See id.  Plaintiff was given ibuprofen for his back pain.  See id. He was told to take one 800 mg tablet every eight hours for five days.  See id.

On January 29, 2020, Plaintiff was seen in Health Services for a chronic care clinic encounter.  See id.  The issues addressed at that encounter were his history of Hepatitis C and his neurological concerns.  See id.  Regarding the neurological concerns, it was noted that Plaintiff had a history of seizures and that he had previously been on medication for the issue.  See id.  It was noted that a request for a neurological consult had already been placed.  See id.  Plaintiff

---

[20] Narcan is used for the treatment of an opioid emergency or a possible opioid overdose with signs of breathing problems and severe sleepiness or not being able to respond.  It works by temporarily reversing the effects of opioid medicines.  The medicine in Narcan has no effect in people who are not taking opioid medicines.  See id.

denied any seizure activity since his return from the ER, and Plaintiff denied any pain.  See id.
As a result of the assessment, Plaintiff was prescribed Oxcarbazepine to address his complaints
of seizure.  See id.  However, it was noted in his assessment that it was unclear whether Plaintiff
had a true seizure due to the factors that indicated his medical emergencies was the result of drug
ingestion.  See id.

Based on the above, Plaintiff has received adequate and continuous care for each of his
medical conditions.  Under the objective component, therefore, Plaintiff cannot prove that his
medical conditions were not timely or properly treated.

### b.     The Subjective Component

Because Plaintiff cannot meet the objective component of the analysis, a continued
analysis of the subjective component is not necessary.  However, even if this Court were to
consider the subjective component, Plaintiff's claim would fail, as there is no culpable state of
mind by any defendant.

The subjective component follows from the principle that "only the unnecessary and
wanton infliction of pain implicates the Eighth Amendment." Wilson, 501 U.S. at 297 (internal
quotation marks, emphasis, and citations omitted).  To state a claim of deliberate indifference,
the prison official must, subjectively, have a "sufficiently culpable state of mind," and the
prisoner must have alleged facts sufficient to indicate a culpable state of mind on the part of a
prison official.  Id.

In defining the subjective component of "deliberate indifference," the United States
Supreme Court explained:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the
> unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment.
> This is true whether the indifference is manifested by prison doctors in their
> response to the prisoner's needs or by prison guards in intentionally denying or

delaying access to medical care or intentionally interfering with the treatment one prescribed.

Estelle, 429 U.S. at 104-05 (internal quotation and citation omitted).

In Farmer, the United States Supreme Court further defined the standard of the culpable mind requirement.  Farmer, 511 U.S. at 837.  A prison official cannot act with deliberate indifference unless the official knows of and disregards an excessive risk to inmate safety or health.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must draw such an inference. Id.; see also, Sandeifer v. Nichols, 62 F.3d 151, 155 (6th Cir. 1995).  The reason for the intent requirement is based upon the Eighth Amendment, which bans only cruel and unusual punishment.  Wilson, 501 U.S. at 300; Brooks v. Celeste, 39 F. 3d 125, 128 (6th Cir. 1994).

Moreover, according to the Fourth Circuit Court of Appeals, the test for deliberate indifference:

> [A]ffords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.  Courts will 'disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment.'

Inmates of Allegheny County Jail v. Pierce,, 612 F.2d 754, 762 (3rd Cir. 1979)(citing Bowring v. Godwill, 551 F.2d 44, 48 (4th Cir. 1977)).

Where the exercise of medical judgment is a central issue in the case, a complaint alleging deliberate indifference under the Eighth Amendment arises to no more than potential medical malpractice and is not actionable under the Constitution.  See Estelle v. Gamble, 429 U.S. 97, 107 (1976)(where an inmate alleged that several options regarding the treatment of his back were not pursued, the Court held that "[a] medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment).

In fact, questions of medical judgment generally are not subject to judicial review. See Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975). And per Estelle, a complaint which alleges negligence in diagnosing or treating a medical condition "does not state a valid claim of medical mistreatment under the Eighth Amendment." Id.; see also, Russell v. Sheffer, 528 F.2d at 319 (stating that mere malpractice does not state a federal claim); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986)(holding that mere negligence in diagnosis does not state a federal claim).

Finally, the Estelle Court pronounced that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. "If the claim concerns a disagreement between an inmate and medical personnel regarding diagnosis and course of treatment, the Eighth Amendment is not implicated." Lewis v. Angelone, 926 F. Supp. 69, 73 (W.D. Va. 1996).

In the instant case, Plaintiff essentially disagrees with the decision by medical staff at FCI McDowell on the course of treatment for his medical condition. However, Plaintiff's disagreement over the appropriate course of treatment does not rise to the level of a constitutional violation. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)(disagreement between inmate and physician over proper medical care does not state constitutional claim).

Finally, courts have routinely held that an inmate cannot establish a claim of deliberate indifference when the medical records clearly show that the inmate received continuous and appropriate care for his medical conditions. See Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998)(missing diagnosis of pituitary tumor which led to inmate's loss of sight did not amount to deliberate indifference when physicians treated symptoms presented by inmate and consulted with specialists); Davis v. Williamson, 208 F. Supp. 2d 631 (N.D. W.Va. 2002)(finding no evidence of deliberate indifference to plaintiff's known serious medical condition when

plaintiff's medical records showed that he was examined and treated by medical staff on numerous occasions for all of his complaints).

Plaintiff's medical record demonstrates that he has received timely, continuous, and appropriate medical care for his conditions. Plaintiff has refused to comply with BOP procedures for notifying staff of his concerns. Specifically, he stated during his intake examination on July 23, 2019 that he experienced several small seizures a year that he did not "bother" medical about. See Defendants' Exhibit 3, Attachment A. Also, during that same encounter, Plaintiff denied that he had any dental condition. See id.

Additionally, since his transfer to FCI McDowell, he has submitted only one sick call form. See id. He has submitted no dental sick call requests, and none of his medical records from FCI McDowell reflect that he complained to any medical staff about dental discomfort. See id. Plaintiff has received care for his medical emergencies, and each time he has returned to health services for follow up examinations, he has denied pain, he has reported no injuries, his skin has been dry and intact, his affect has been pleasant and/or cooperative, and he has appeared well, alert, and oriented. See id. The one time he did report pain after returning from an emergency medical trip was on January 6, 2020, when he reported to medical he was experiencing serious throbbing back pain. See id. Plaintiff was provided Ibuprofen, and the next time he was seen by health services, January 29, 2020, he reported no pain and no further seizure activity. See id.

There is simply no evidence of deliberate indifference to Plaintiff's medical condition. As Defendants were not deliberately indifferent to Plaintiff's medical care, this action must be dismissed.

### F. Defendants Are Entitled to Qualified Immunity

Federal executive officers and employees who are sued for constitutional torts may invoke the defense of qualified immunity. Butz v. Economou, 438 U.S. 478 (1978). Qualified immunity is an "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

In Batten v. Gomez, 324 F.3d 288 (4th Cir. 2003), the Fourth Circuit exercised its opportunity to apply the qualified immunity standard set forth by the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001). In Batten, the Court of Appeals framed the standard:

> As a "threshold question," a court must ask whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right." If the answer is no, then the analysis ends; the plaintiff cannot prevail. If the answer is yes, then "the next, sequential step is to ask whether the right was clearly established" at the time of the events at issue. This determination must be made "in light of the specific context of the case, not as a broad general proposition." If the right was not "clearly established in the 'specific context of the case' - that is, if it was not 'clear to a reasonable officer' that the conduct in which he allegedly engaged 'was unlawful in the situation he confronted'" - then the law affords immunity from suit. Accordingly, the answer to both Saucier questions must be in the affirmative in order for a plaintiff to defeat a defendant police officer's motion for summary judgment on qualified immunity grounds.

Batten v. Gomez, 324 F.3d 288, 293-94 (4th Cir. 2003)(internal citations omitted).

The analysis was relaxed in the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818, (2009). In Pearson, that case, the Supreme Court clarified that the rigid two-step process in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001), was no longer mandatory. A court may now use discretion in deciding which step should be considered first. See Ratliff v. Shackleford, No. 2:13-cv-32917, 2015 WL 2452500 (S.D.W.Va. May 21, 2015)(J. Goodwin)(noting Pearson's holding that Saucier is no longer mandatory).

Under either of the Saucier steps, it is clear that the facts as alleged by Plaintiff fail to show a violation of a constitutional right. As Plaintiff was timely and properly treated, the

Eighth Amendment is not implicated. Even if the Eighth Amendment was implicated, Plaintiff was provided constant and appropriate medical treatment for his conditions and has failed to establish deliberate indifference on the part of staff. Rather, Plaintiff merely disagrees with the type of treatment he was provided, which does not amount to a constitutional violation.

Moreover, Plaintiff's other claims relating to constitutional violations fail as a matter of law, as there is no <u>Bivens</u> cause of action for such claims. Even if causes of action existed under <u>Bivens</u> for the alleged constitutional violations, Plaintiff has failed to state a claim upon which relief may be granted, entitling the Defendants to qualified immunity.

## V. <u>CONCLUSION</u>

For all of the foregoing reasons, this action should be dismissed. In the alternative, Summary Judgment should be granted in favor of the Defendants.

Respectfully submitted,

MICHAEL B. STUART
United States Attorney


**s/Matthew C. Lindsay**
Assistant United States Attorney
WV State Bar No. 7896
Counsel for United States
United States Attorney's Office
300 Virginia Street, E, Room 4000
Charleston, WV 25301
P: 304-345-2200 F: 304-347-5443
E: matthew.lindsay@usdoj.gov